**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CASE NO. 1:05 CR 00293** |
| | ) | |
| PLAINTIFF | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| ABUBACRI SO | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS | ) | |

This matter is before the Court upon the Defendant's Motion to Suppress Evidence. <u>See</u> (Dkt. # 20).

Having considered the evidence presented, the testimony of witnesses, and the arguments of counsel, the Court hereby issues the following findings of fact and conclusions of law.

**I.     FACTUAL FINDINGS**

On August 18, 2004, Dean Williams ("Williams"), Enforcement Agent, Ohio Department of Taxation, and other representatives of the agency conducted a sweep of Cleveland, Ohio convenience stores for the purpose of ensuring compliance with the State of Ohio's cigarette and tobacco licensing laws.  <u>See</u> (Dkt. # 1, Aff. of Michael T. Dixon ("Dixon Aff.") ¶ 6;[1] Tr. of Proceedings Before the Hon. Peter C. Economus, August 16, 2005 ("Tr.")

_____

[1]The Court relies on the factual assertions of the Dixon Aff., which was offered in  support for the issuance of the Criminal Complaint, for background information

-1-

at 2-3[2]).    While investigating one convenience store, Williams observed a box containing eighty-six DVDs concealed behind the store's front counter.    <u>See</u> (Dixon Aff. ¶ 6).    Williams believed the box to contain counterfeit DVDs of recently released movies.    <u>See</u> (Dixon Aff. ¶ 6).    The store's owner advised that prior employees had brought the counterfeit DVDs into the store.  <u>See</u> (Dixon Aff. ¶ 7).

Special Agent Michael Dixon ("SA Dixon") of the Federal Bureau of Investigation ("FBI"), Computer Crimes Squad, Cleveland Division, initiated an investigation into the large scale distribution and sale of counterfeit or "pirated" copyrighted movie DVDs and music CDs throughout the greater Cleveland area.    <u>See</u> (Dkt. # 22 at 1).    During the course of the investigation, a confidential source ("CS") advised SA Dixon that an individual named "Abu" was selling counterfeit DVDs in front of Cleveland area convenience stores.    <u>See</u> (Dixon Aff. ¶ 7; Tr. at 37-38).    The CS telephonically contacted an individual identified as Mashool, a manager of one such convenience store, and offered to purchase DVDs from Abu.    <u>See</u> (Dixon Aff. ¶ 8).    Mashool advised the CS that Abu no longer sold DVDs; however, Mashool further advised that Abu's relative, Mohammad, sold DVDs for $3.50 per unit and CDs for $1.50 per unit.    <u>See</u> (Dixon Aff. ¶ 8).    Mashool provided the CS with a telephone number for Mohammad. <u>See</u> (Dixon Aff. ¶ 8).

---

relating to the investigation.  The affiant testified during the hearing that the affidavit accurately represented the chronology of the investigation.  (Tr. at 3.)

[2]In the interest of expeditiously resolving the present motion, the Court shall cite to an uncertified, unedited transcript of the motion to suppress hearing.  Citations to specific page numbers may differ from the final certified version of the transcript.

A Grand Jury subpoena was issued to the service provider for the telephone number provided by Mashool.  <u>See</u> (Dixon Aff. ¶ 9).  The subscriber for the account was identified as Mamadou Sy ("Sy").  <u>See</u> (Dixon Aff. ¶ 9).

On December 16, 2004, the CS conducted two recorded conversations with Sy whereby the CS agreed to purchase 100 DVDs in front of the convenience store where Mashool served as the manager.  <u>See</u> (Dixon Aff. ¶ 10).  The following day, the CS arrived to purchase the DVDs and recorded a conversation with Mashool and Sy.  <u>See</u> (Dixon Aff. ¶ 11).  During that conversation, Mashool advised that "Abu" sold DVDs as a wholesaler.  <u>See</u> (Dixon Aff. ¶ 11).  Sy and the CS subsequently drove their vehicles behind the shopping plaza where FBI agents observed the CS purchase approximately 120 counterfeit DVDs from Sy at a total cost of $400.00 ($3.25 per unit).  <u>See</u> (Dixon Aff. ¶ 11).

The CS later advised SA Dixon that five or six boxes of counterfeit DVDs were stored in the trunk and backseat of Sy's automobile.  <u>See</u> (Dixon Aff. ¶ 12).  The CS further advised that Sy used black plastic bags used to package the DVDs for the customer.  <u>See</u> (Dixon Aff. ¶ 12).

On January 4, 2005, the CS again arranged to purchase DVDs from Sy.  <u>See</u> (Dixon Aff. ¶ 13). The pair arrived at the convenience store and FBI agents observed the CS purchase 166 counterfeit DVDs from Sy at a total cost of $500.00 ($3.00 per unit).  <u>See</u> (Dixon Aff. ¶ 13).

On February 4, 2005, the CS contacted SA Dixon and indicated that he had obtained a telephone number for "Abu."  <u>See</u> (Dixon Aff. ¶ 16).  The CS contacted "Abu" and indicated that he previously had purchased DVDs from Sy (aka Mohammad).  The CS also indicated that he

would prefer to purchase DVDs from "Abu."  <u>See</u> (Dixon Aff. ¶ 16).  "Abu" purportedly stated that "Mohammad buys from us" and that he would sell the CS counterfeit DVDs.  <u>See</u> (Dixon Aff. ¶ 16).

A Grand Jury subpoena was issued to the service provider for the telephone number provided by the CS.  <u>See</u> (Dixon Aff. ¶ 17).  The service provider identified the defendant, Abubacri So ("So"), as the account holder.  <u>See</u> (Dixon Aff. ¶ 17).  SA Dixon thereafter conducted a records search which revealed that So's most recent address was 99 Maud Avenue, Cleveland, Ohio (hereinafter the "residence").  <u>See</u> (Dixon Aff. ¶ 18).

On March 9, 2005, the CS participated in three recorded conversations with So whereby So agreed to sell several thousand dollars of counterfeit DVDs to the CS.  <u>See</u> (Dixon Aff. ¶ 20).  Pursuant to So's instructions, the CS met So the following day at a service station and the pair traveled to Liberty Self-Storage, 5440 South Marginal Road, Cleveland, Ohio ("Liberty Self-Storage").  <u>See</u> (Dixon Aff. ¶ 21).  FBI agents observed the CS and So begin loading boxes from a storage unit located between columns marked 111 and 112 (hereinafter the "storage unit") into their respective vehicles.  <u>See</u> (Dixon Aff. ¶ 20; Tr. at 5).  The CS ultimately negotiated the purchase of 800 counterfeit DVDs from So for approximately $2,000.00 ($2.50 per unit).  <u>See</u> (Dixon Aff. ¶ 20; Tr. at 3-4).

On March 15, 2005, the CS engaged in another monitored telephone call with So whereby the parties agreed to meet at a service station.  <u>See</u> (Dixon Aff. ¶ 21).  So and the CS again traveled to the Liberty Self-Storage and began loading boxes from the storage unit into the CS's vehicle.  <u>See</u> (Dixon Aff. ¶ 21; Tr. at 5).  The CS negotiated the purchase of 1000

-4-

counterfeit DVDs and 200 counterfeit CDs from So at a total cost of $2,450.00 ($2.25 per unit DVD and $1.00 per unit CD).  See (Dixon Aff. ¶ 21; Tr. at 4-5).

SA Dixon subsequently examined the counterfeit materials purchased by the CS.  See (Dixon Aff. ¶ 22).  The examination revealed that a significant number of the DVDs were being shown solely in movie theaters, while the remaining were titles available on DVD.  See (Dixon Aff. ¶ 22).  SA Dixon observed that the packaging of the DVDs was labeled with poor reproductions of movie posters and that no movie titles were printed on the DVDs.  See (Dixon Aff. ¶ 22).  Moreover, on multiple occasions during March 2005, SA Dixon searched bags of garbage located at the residence and discovered multiple documents bearing the name Abubacri So.  See (Dixon Aff. ¶¶ 23-25).

On March 25, 2005, FBI agents observed on three occasions So and several individuals load boxes from the storage unit into their vehicles.  See (Dixon Aff. ¶ 26; Tr. at 6).  The FBI agents further observed So immediately travel to two convenience store locations and meet with individuals in the parking lot.  See (Dixon Aff. ¶ 26; Tr. at 6).  At the second location, an individual exited So's vehicle carrying a black trash bag. See (Dixon Aff. ¶ 26; Tr. at 6).

SA Dixon appeared before United States Magistrate Judge William H. Baughman, Jr. on May 5, 2005 and swore out a criminal complaint against the Defendant alleging violations of 17 U.S.C. § 506 (willful and knowing infringement of copyrights for the purpose of commercial advantage and personal financial gain), 18 U.S.C. § 2318 (knowingly affixing counterfeit labels to counterfeit copies of copyrighted works), and 18 U.S.C. § 2319 (willful and knowing infringement of copyrights for the purpose of commercial advantage and personal

financial gain).  See (Dkt. # 1).  Magistrate Judge Baughman immediately issued an arrest warrant for the defendant.  See (Dkt. # 2).  Magistrate Baughman further issued a search warrant authorizing the search of the storage unit.  See (Tr. at 7).

On May 9, 2005, a team of 2 FBI agents traveled to the storage unit for the purpose of executing the search warrant.  See (Dkt. # 22 at 4; Tr. at 8, 35).  At approximately 6:45 a.m., a team of 8 FBI agents, wearing bulletproof vests, arrived at the residence for the purpose of executing the arrest warrant for So.  See (Dkt. # 22 at 4; Tr. at 8, 35).  SA Dixon knocked and announced their presence.  See (Dkt. # 22 at 4; Tr. at 9).  After receiving no answer, SA Dixon again knocked and announced.  See (Tr. at 9).  A male occupant answered the door and SA Dixon pulled the occupant outside and placed him against the wall.  See (Dkt. # 22; Tr. at 10, 33-34, 51).  Immediately, FBI Agent Jeff Luders ("Agent Luders") began to issue commands to a second male occupant that appeared from the second floor of the residence.  See (Dkt. # 22 at 4; Tr. at 10).  Agent Luders and SA Dixon placed the second occupant against the wall. See (Dkt. # 22 at 4; Tr. at 11).  The agents then patted down and handcuffed the first and second occupants.  See (Dkt. # 22 at 4; Tr. at 11).

FBI Agent Charlie Sullivan ("Agent Sullivan") and FBI Joint Terrorism Task Force Officer Robert Toth ("TFO Toth") meanwhile continued up the stairs "to make sure that no one else was present that could do harm to the officers, or the people . . . currently detained."  See (Tr. at 12, 51-52).  During the course of the protective sweep, Agent Sullivan and TFO Toth discovered four doors on the second floor – specifically, a locked door at the top of the stairs, an unlocked closet door, another locked door, and an unlocked door at the end of a hallway

-6-

leading to a master bedroom.  See (Dkt. # 22 at 5; Tr. at 52).  As the agents proceeded down the hall to the unoccupied master bedroom, they noticed movement toward their rear.  See (Dkt. # 22 at 5; Tr. at 53).  The agents turned around and observed a male exiting from behind one of the locked doors.  See (Dkt. # 22 at 5; Tr. at 53).  The agents requested the individual to stop moving; however, the individual did not immediately comply.[3]  See (Dkt. # 22 at 5; Tr. at 53).  Agent Sullivan and TFO Toth subdued, patted down and handcuffed the third occupant.  See (Dkt. # 22 at 5; Tr. at 53).

SA Dixon heard the "scuffle" upstairs and rushed to the second floor in order to provide assistance.  See (Tr. at 13-14, 54).  He ordered the agents to enter the remaining locked room in order to "make sure that [they] had no other individuals in the house that could do harm to [them] or others."[4]  See (Tr. at 14, 25-26, 31-32, 39, 55).  TFO Toth kicked through the locked

---

[3]TFO Toth testified regarding the conduct of the third occupants as follows:

> He kind of – gave me the "who me" look?  Like you know, what's going on here?  and I asked him again to show me his hands. He was secured, handcuffed, placed to the ground, handcuffed and he was instructed, hey listen, I don't know who you are.  I don't know – you know, you're being detained for officer safety right now We are trying to make sure that no one is going to get hurt here.
> I don't recall any conversation with him at all.  He did not even say a word. No response.  I don't know if he understood English or not.

(Tr. at 54.)

[4]SA Dixon testified:

> A protective sweep is a visual clear of a room to ascertain if somebody is in the room.  Specifically, we're looking for the subject of an arrest warrant or anybody else that would do harm to those present in the building, agents and nonagents alike.

door and entered the room.  See (Dkt. # 22 at 5; Tr. at 14, 55).  TFO Toth entered the room and performed a "visual clear" to the left of the room.  See (Tr. at 14-16, 55; Gov's Ex. # 1).  SA Dixon followed and performed a "visual clear" to the right of the room, including a closet.  See (Tr. at 14-16).   Upon entering and moving through the room, the agents observed a computer, several DVD burners, large piles of DVDs and labels, as well as numerous other items scattered throughout the room.  See (Dkt. # 22 at 5).   The agents determined that the room was unoccupied and exited less than one minute following their entry.  See (Dkt. # 22 at 5; Tr. at 17).

SA Dixon and FBI Agent Chris Galomb thereafter determined that the second occupant, identified as Ismalia Sy, was the owner of the residence.  See (Dkt. # 22 at 6; Tr. at 17, 70-71). Ismalia Sy advised that he purchased the residence two years prior and that he rented a room to So for $200 per month.  See (Tr. at 18).  The third occupant, identified as Ousman Saul, also resided in the residence.[5]  See (Dkt. # 22 at 6; Tr. at 17); see also (Dkt. # 20 at 4).  Ismalia Sy consented to a search of the residence, with the exception of So's previously locked room.  See (Dkt. # 22 at 6; Tr. at 18, 49, 83-85; Gov's Ex. 12).  During the ensuing consent search, the

_____

(Tr. at 28.)

[5]Ismalia Sy testified at various occasions that he did not read the consent to search form and, or, that he did not consent to the search of his residence.  Having the opportunity to observe Ismalia Sy's demeanor during the hearing, the Court deems this testimony unreliable.  Ismalia Sy appeared to confuse the signing of the consent to search form with his signing of the inventory of items seized from the residence – the latter occurring well after the initial search of the residence.  See (Tr. at 73-74, 78-83). The Court further finds that SA Dixon's testimony was reliable in that Ismalia Sy signed the consent to search form prior to any search of the residence.  See (Tr. at 84).

agents discovered thousands of counterfeited and blank DVDs and CDs in the common areas such as the basement and closets.  See (Dkt. # 22 at 6; Tr. at 19).  Ismalia Sy stated that the contraband belonged to So.  See (Dkt. # 22 at 6; Tr. at 19, 39).

The agents meanwhile determined that So was the individual that initially opened the door to the residence, placed So under arrest, and advised So of the rights secured by  Miranda v. United States, 384 U.S. 436 (1966).  See (Tr. at 34, 42).  So invoked his right to remain silent.  See (Dkt. # 22 at 6; Tr. at 42, 71-72).  SA Luders advised So that he possessed a search warrant for the storage unit and produced a set of keys.  See (Dkt. # 22 at 6; Tr. at 43).  The agents further advised So that in the event  that he could identify the key for the storage unit, there would lack any need to cut the storage unit's lock.  See (Dkt. # 22 at 6 n.1).  So then pointed to the correct key.  See (Dkt. # 22 at 6 n.1).

SA Dixon contacted Assistant United States Attorney Robert Kern ("AUSA Kern") concerning whether a search warrant was required to search the entirety of the residence, including the locked rooms.  See (Tr. at 19-20; 30-32).  SA Dixon appeared before Magistrate Judge Baughman at 9:00 a.m. for the purpose of obtaining a search warrant.  See (Dkt. # 22 at 7; Case No. 1: 05 MJ 9053, Dkt. # 1).  Magistrate Judge Baughman issued the search warrant, see (Case No. 1:05 MJ 9053, Dkt. # 2), and SA Dixon thereafter contacted Agent Sullivan, who remained at the residence, in order to effectuate the search.  See (Dkt. # 22 at 7; Tr. at 20).

The agents re-entered So's bedroom and seized: (1) three Acard Technology 8-disk DVD burners; (2) a Gateway computer; (3) an HP printer; (4) a high speed DSL modem; (5) 1,053 counterfeit DVDs; (6) 1,685 counterfeit CDs; and (7) numerous counterfeit labels. See

(Dkt. # 22 at 7; Tr. at 45-46).

Agents likewise executed the search warrant at the storage unit and seized 5,644 counterfeit DVDs and 3,574 counterfeit CDs.  See (Dkt. # 22 at 7).

The defendant appeared before Magistrate Judge Baughman on May 16, 2005 for a preliminary hearing and detention hearing.  See (Dkt. # 3).  During the hearing, the Government indicated that the defendant was an illegal alien having a pending immigration detainer filed by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement.  Magistrate Judge Baughman ultimately ordered that the defendant be detained and bound over the case to the grand jury.  See (Dkt. # 3; Dkt. # 4).

On June 8, 2005, the Grand Jury for the United States District Court, Northern District of Ohio issued a three count Indictment charging the defendant with violations of 17 U.S.C. § 506 (a)(1) and  18 U.S.C. § 2319(b)(1) ("Counts I & II"), and 18 U.S.C. § 2318(a) ("Count III").

The instant motion ensued.

## II.    LAW AND ANALYSIS

"'It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.'"  United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting United States v. Feldman, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant has filed a motion seeking the suppression of "certain evidence, in the form of statements and physical evidence obtained by the Government as a result of illegal search and seizure in violation of the Fourth Amendment to the United States Constitution."  (Dkt. # 20 at 1).  Specifically, the

defendant asserts:

> [SA] Dixon's admission that he did not have a warrant for the search of the Maude Ave. house or any separate and/or locked bedroom, whom he learned belonged to a tenant, [So], whom paid $200.00 for its monthly rental, at the time that a huge gaping hole was made through the door so that entry can be gained necessitates the suppression of any and all evidence found therein.

(Dkt.# 20 at 5-6).   The defendant further asserts that "by asking [him] about the whereabouts of the key to the storage shed, the agents violated [his] constitutional right against self-incrimination, since [he] exercised his right to remain silent and did not initiate information with the agents."  (Dkt. # 20 at 7.)

### A.      Fourth Amendment – Search of the Residence

So contends that the search of the residence violates his right to be free from warrantless searches and seizures as secured by the Fourth Amendment to the United States Constitution.  See (Dkt. # 20 at 5-6).  The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S CONST. amend. IV.   The warrant requirement protects against unreasonable intrusions by government agents through ensuring: (1) that a neutral and detached officer of the judiciary measure the probable cause asserted; and that (2) "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  See also Johnson v. United States, 333 U.S. 10, 14 (1948) ("The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn

-11-

by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

*Consent Search*

It is undisputed that the law enforcement officers did not obtain a search warrant prior to the initial search of the residence.[6]   Warrantless searches are per se unreasonable, subject to a limited number of exceptions.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One such exception to the warrant requirement arises where a person with a privacy interest in the item to be searched gives free and voluntary consent.  See Schneckloth, 412 U.S. at 222; accord United States v. Kelly, 913 F.2d 261, 265 (6th Cir. 1990).  "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."  United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (citing Schneckloth, 412 U.S. at 219).

"[C]onsent in all cases must be voluntary."  United States v. Hudson, No. 04-5092, (6th Cir. Apr. 22, 2005) (citation omitted).  It is the Government's burden, by a preponderance of the evidence, to show through "clear and positive testimony" that valid consent was obtained. See United States v. Scott, 578 F.2d 1186, 1188 (6th Cir. 1978). Whether a party freely and voluntarily consented to a warrantless search is determined by examining the totality of the circumstances.  See Schneckloth, 412 U.S. at 226.   Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the

---

[6]It is further undisputed that the search warrant ultimately issued for the residence was issued, in part, on information obtained during the consent search and protective sweep discussed herein.  See (Def.'s Ex. A).

individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.  See United States v. Jones, 846 F.2d 358, 360 (6th Cir.1988) (citing Schneckloth, 412 U.S. at 226, 248); United States v. Burns, 298 F.3d 523 (6th Cir. 2002) (finding that consent was freely given and not invalidated even where appellant was handcuffed and in custody at the time).

It is uncontroverted that Ismalia Sy, as the owner of the residence, had an expectation of privacy in the premises.[7]  It is further uncontroverted that Ismalia Sy consented to the law enforcement officers' search of the residence.  He signed the Consent to Search form.  See (Gov.'t's Ex. # 12). The Consent to Search form was the standard form utilized by the FBI Service which required the signatory to acknowledge the individual's right to be free from a warrantless search, as well as to consent to the search.  See (Gov.'t's Ex. # 12).

In addition, there lacks any credible and reliable evidence before the Court to suggest that Ismalia Sy's consent was involuntary.  Indeed, the Defendant did not present any testimony suggesting that Ismalia Sy felt coerced or distraught when signing the Consent to Search form.[8] Cf.  United States v. Crowder, 62 F.3d 782, 787 (6th Cir. 1995) ("[T]he defendant must show

---

[7]As the Defendant was at the very least a guest at the residence, he also had a privacy interest in objects located within the premises.  See generally Minnesota v. Olsen, 495 U.S. 91 (1990) (holding that an overnight guest has a legitimate expectation of privacy under certain circumstances).

[8]It is uncontroverted that Ismalia Sy was not handcuffed at the time he signed the Consent to Search form.  Moreover, the Defendant has not argued at any time that Ismalia Sy's consent resulted from coercion or duress.

-13-

more than a subjective belief of coercion, but also some objectively improper action on the part of the police.").

The threshold issue before the Court, therefore, concerns the scope of Ismalia Sy's consent.  The concept of "common authority or control" enables a co-occupant, such as Ismalia Sy, to consent to a search if that party has the right to use or possess the property.  See United States v. Matlock, 415 U.S. 164 (1974).  The Supreme Court has defined "common authority or control" as:

> [the] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their members might permit the common area to be searched.

Matlock, 415 U.S. at 171 n. 7.

The Defendant apparently seeks to suppress evidence – namely, thousands of counterfeit DVDs and CDs – that the law enforcement officers discovered during their search of the common areas of the residence.

The United States Court of Appeals for the Sixth Circuit has held that where "an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed."  United States v. Carriger, 541 F.2d 545, 552 (1976).  In the present matter, however, the owner of the premises – Ismalia Sy – consented to the search of the common areas.  It is well-established that a landlord may consent to the search of the common areas of a leased premises.  See generally United States v. Hunyady, 409 F.3d 297 (6th Cir. 2005) (discussing the extent of landlord's consent to

-14-

search).  It follows that the law enforcement officers lawfully searched the common areas of the residence pursuant to Ismalia Sy's consent.[9]  Therefore, the Court shall decline to suppress the evidence seized from the common areas of the residence.

Nevertheless, a landlord does not have common authority over an apartment or other dwelling unit leased to a tenant.  See, e.g., Chapman v. United States, 365 U.S. 610, 616-18 (1961).  Beyond this general rule, the unchallenged record before the Court reveals that Ismalia Sy's consent to search expressly excepted So's locked bedroom.[10]  See (Tr. at 29).  It follows that the consent to search did not obviate the warrant requirement for the search of So's locked bedroom.

*Protective Sweep*

The dispositive issue before the Court, therefore, is whether the facts and circumstances relating to the search of So's locked bedroom give rise to another exception to the warrant

---

[9]Courts generally are reluctant to limit the scope of consent to search a room to exclude the search of drawers and closets.  See, e.g., United States v. Ross, 456 U.S. 798, 820-21 (1982) ("[A] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search . . . . [When] a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers . . . must give way to the interest in the prompt and efficient completion of the task at hand."); United States v. Melgar, 227 F.3d 1038, 1041 (7th Cir. 2000) ("Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container.").

[10]Irrespective of whether a search is authorized by consent, "the scope of the search is limited by the terms of its authorization."  Walter v. United States, 447 U.S. 649, 656 (1980).  "[T]he scope of a suspect's consent under the Fourth Amendment" turns on what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]"  Florida v. Jimeno, 500 U.S. 248, 251 (1991).

requirement.  The Government asserts that the law enforcement officers lawfully entered So's locked bedroom in order to conduct a protective sweep of the residence.  Police officers may conduct a "protective sweep" of a residence in the course of making an arrest without running afoul of the Fourth Amendment's prohibition against "unreasonable searches and seizures," U.S. CONST. amend. IV.  See Maryland v. Buie, 494 U.S. 325, 327 (1990).  Under the protective sweep doctrine, officers may quickly look into closets and other places in close proximity to the place of an arrest, after they have secured a suspect, to search for other persons who could launch an attack.  See Buie, 494 U.S. at 334.  In short, a "quick and limited search," is permitted "to protect the safety of police officers" when they "possess[] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[] the officer[s] in believing that the area swept harbor[s] an individual posing a danger to the officer[s] or others."  Buie, 494 U.S. at 327 (quotation and citations omitted); accord United States v. Johnson, 9 F.3d 506, 510 (6th Cir. 1993); United States v. Rigsby, 943 F.2d 631, 637 (6th Cir. 1991).

In United States v. Bass, 315 F.3d 561 (6th Cir. 2002), officers received a report that a male had fired gunshots at two other males and retreated into an apartment. Id. at 563.  The officers knocked on the apartment door, and a woman answered.  When asked who else was present in the apartment, she responded that her husband and children were present.  When a man came into the living room, police handcuffed him and proceeded to conduct a protective sweep of the apartment.  One officer lifted the box springs of a bed to see if anyone was hiding underneath it and when dropping the bed back into place, he spotted a sawed-off shotgun hidden

-16-

between the box springs and the mattress.  The court upheld the search because the officers were not sure that the man that they had handcuffed was the shooter, they had reason to believe there was a loaded weapon in the apartment and the woman's description of the apartment's occupants left open the possibility that other people remained in the apartment.  Id. at 564.  See also United States v. Talley, 275 F.3d 560, 564 (6th Cir. 2001) (protective sweep of residence was justified when officers had articulable reason to believe that others were in the house).

Here, the law enforcement officers effectuating the arrest of So had a reasonable belief that other occupants of the residence posed a threat to their safety.  It is undisputed that the law enforcement officers arrested the first occupant of the residence (who they later discovered was So) and observed a second occupant (Ismalia Sy) moving from the second floor of the residence.  Upon confronting and securing Sy, they proceeded to the area from where Sy came and uncovered a hall with four doors.  Two of the doors were locked.  As they opened the two unlocked doors to search for other occupants, they heard a noise to the rear.  The law enforcement officers observed a third occupant (Saul) exiting one of the locked doors who refused to immediately comply with their request to cease movement.  Upon these factors, the law enforcement officers contend that they reasonably believed that another occupant would be in the remaining locked room, which in turn presented a threat to their safety.

The Defendant attempts to undermine the law enforcement officers' reasons for conducting a protective sweep by emphasizing three factors.  First, the Defendant contends that SA Dixon's immediate seizure of So at the front door eliminated the need to further enter the residence.  See (Dkt. # 27 at 3).  The Court concurs that controlling authority exists supporting

-17-

the Defendant's general statement of search and seizure law.   See United States v. Colbert, 76 F.3d 773, 777-78 (6th Cir. 1996) (holding that protective sweep of apartment after defendant was arrested outside was unreasonable as the officers had no information that additional individuals may have been present in the apartment).  However, the facts of the case *sub judice* render this general authority inapposite.  The Court finds as credible and reliable the testimony revealing that neither SA Dixon nor any other law enforcement officer at the residence recognized that So – the target of the arrest warrant – was the individual that answered the door. See (Tr. at 27-28, 32, 58-59).   The testimony further reveals that while So may have been pulled outside of the residence, the law enforcement officers immediately  observed another individual (Ismalia Sy) moving from the second floor and toward their position. The appearance of an unidentified individual, where the individual potentially could have been the target of the arrest warrant, provided a reasonable basis for continuing movement into the residence to secure the unidentified individual and conduct a protective sweep to search for additional occupants.

The Defendant next contends that as this case involved non-violent crimes, and thus the law enforcement officers lacked a reasonable basis to believe that the appearance of additional occupants posed a threat to their safety.  See (Dkt. # 27 at 3).  The Defendant presents no authority supporting this blanket assertion, and a straightforward interpretation of Buie expressly rejects the Defendant's proposed requirement that a protective sweep be conducted only in the context of violent crimes or arrests of known violent persons.  The Supreme Court in Buie authorized protective sweeps of the home based on the inherent threat that in-home

-18-

arrests pose to officer safety.  See Buie, 494 U.S. at 333 ("[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf."  An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").  Additionally, assuming the Court were to apply the Defendant's strained interpretation of Buie, the record indicates that the law enforcement officers viewed the presence of additional occupants as a threat.  See (Tr. at 13-14, 54-55).  Indeed, the law enforcement officers appeared on the scene wearing protective "bulletproof" vests which they wore throughout the protective sweep.  See United States v. Talley, 275 F.3d 560, 563-64 (6th Cir. 2001) ("This concern is demonstrated by the officers' decision to don bulletproof vests.  At no point during the challenged sweep did the officers remove their vests, suggesting they did not feel truly safe.").

In a final attempt to suppress the evidence seized from the bedroom, the Defendant contends that the protective sweep doctrine does not authorize law enforcement officers to enter a locked room absent a warrant.  While no controlling authority supporting this principle has not been submitted to, or discovered by the Court, the United States Court of Appeals for the Seventh Circuit has declined to suppress evidence seized pursuant to a protective sweep on facts analogous to those presented at bar.  See United States v. Burrows, 48 F.3d 1011 (7th Cir. 1995).

In Burrows, law enforcement officers attempting to effectuate the arrest of two individuals at an apartment observed a curtain moving in an upstairs window and heard movement behind the door.  Id. at 1012. A target of the arrest warrant opened the door after a

-19-

period of delay and was placed under arrest.  Id.  A law enforcement officer proceeded to the second floor where he encountered six doors, one of which led to an open room occupied by the other target of the warrant.  Id.  Three law enforcement officers then forcibly opened the remaining locked doors whereupon they discovered a firearm in plain view.  Id.  The court upheld the district court's denial of a motion to suppress the firearm finding that the officers' observations of movement by the second floor curtain, coupled with the discovery of an occupant on the second floor, provided "understandable cause for concern."  Id. at 1017.  The court held that this concern authorized the entry into the locked room to search for other occupants.  Id. at 1017.

This Court likewise upholds the search of the locked bedroom in the present matter. In contrast to Burrows, here the FBI Agents observed more than a curtain moving on the second floor – they actually observed a person moving from the second floor while they seized the occupant who answered the door.  After proceeding to the second floor, the law enforcement officers heard a third occupant emerge from behind a locked door.  The third occupant did not immediately respond to the law enforcement officers' commands.  At this time, the law enforcement officers did not know whether one of the three seized individuals was the target of the arrest warrant.  Additionally, as TFO Roth testified, there was cause for concern that other individuals were located behind the remaining locked door "hiding, sleeping, or what." (Tr. at 54.)  Accordingly, the Court finds that the law enforcement officers lawfully entered the Defendant's locked bedroom for the limited purpose of conducting a protective sweep.

The Court further finds that TFO Roth and SA Dixon conducted the protective sweep in

-20-

accordance with governing authority.    Upon entering the locked room, TFO Roth and SA Dixon

quickly secured the scene in less than a minute and immediately exited.    The officers then

awaited to conduct a full search of So's bedroom until SA Dixon secured a search warrant.[11]

See  United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he Supreme Court has held

that because evidence may be removed or destroyed before a warrant can be obtained, an

officer does not violate the Fourth Amendment by securing the area to be searched and waiting

until a warrant is obtained.").    As there is no challenge to the subsequent search warrant, and

the Court finds that the law enforcement officers lawfully entered the locked bedroom at the

initial instance pursuant to a protective sweep, the motion to suppress relating to Fourth

Amendment violations is **DENIED.**

### B.        Fifth Amendment - <u>Miranda</u>

The final suppression issue before the Court concerns So's alleged pointing to a key for

the storage unit.    It is a fundamental tenet of our criminal justice system that a defendant may

not be "compelled in any criminal case to be a witness against himself."    U.S. CONST. amend.

V.  The Supreme Court held in <u>Miranda</u>, 384 U.S. at 478-79, that a suspect subject to custodial

interrogation must first be given notice of his or her right against self-incrimination.

Statements obtained during custodial interrogation in violation of <u>Miranda</u> may not be admitted

---

[11]The Court observes that the items seized from the locked bedroom were in plain
view at the time of TFO Roth and SA Dixon's entry.  <u>See</u> (Gov't's Exs. 1-11).  If, during
the protective sweep, officers see items in plain view and have probable cause to believe
those items are evidence of a crime, they may seize them. <u>Buie</u>, 494 U.S. at 330;
<u>Arizona v. Hicks</u>, 480 U.S. 321, 326-27 (1987).

for certain purposes in a criminal trial. Id. at 479.  However, the obligation to administer a

Miranda warning to a suspect only arises "where there has been such a restriction on a person's

freedom as to render him 'in custody.'"  Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per

curiam).

In determining whether a defendant was subject to custodial interrogation, the Court

looks to the totality of the circumstances to determine "how a reasonable man in the suspect's

position would have understood the situation."  United States v. Phillip, 948 F.2d 241, 247 (6th

Cir. 1991).  The "ultimate inquiry is simply whether there is a formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest."  United States v. Knox,

839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)

(per curiam) (internal quotation marks omitted)).

It is undisputed that So was in custody at the time he showed the key for the storage unit

to the law enforcement officers.  It is further undisputed that So invoked his right to remain

silent immediately after his arrest and did not initiate contact with the officers.  However, the

Court need not proceed with its analysis because the Government has represented that it does

not intend to introduce at trial any evidence relating to So's post-arrest conduct in regard to the

storage unit keys.  To the extent that Defendant's motion may be interpreted at seeking to

suppress evidence seized from the storage unit, such attempt is without merit in light of the

search warrant issued for said storage unit.  See United States v. Kennedy, 61 F.3d 494, 497

(6th Cir. 1995) (describing the "inevitable discovery doctrine," which "allows unlawfully

obtained evidence to be admitted at trial if the government can prove by a preponderance that

-22-

the evidence inevitably would have been acquired through lawful means.").

**III.    CONCLUSION**

For the foregoing reasons, the Court hereby orders that the Defendant's Motion to Suppress Evidence, <u>see</u> (Dkt. # 20), is **DENIED**.


**IT IS SO ORDERED**.

 **s/ Peter C. Economus - August 19, 2005** 
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**